Wells v. Chater, Comm's SSA        CV-94-439-JD  04/30/96

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Carle Wells

        v.                              Civil No. 94-439-JD

Shirley Chater, Commissioner,
Social Security Administration


O R D E R


        The plaintiff, Carle Wells, brings this action pursuant to §
205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking
review of a final decision of the defendant, Commissioner of the
Social Security Administration ("Commissioner"), denying his
claim for benefits under the Act.  Before the court are the
plaintiff's motion to remand the Commissioner's decision
(document no. 13) and the defendant's motion to affirm the
Commissioner's decision (document no. 16).


Background

        Pursuant to Local Rule 9.1, the parties have filed the
following joint statement of material facts, which the court
incorporates verbatim:


I.  ADMINISTRATIVE PROCEEDINGS.

        At issue here is an application for Supplemental Security
Income ("SSI") payments, based on disability, filed by Plaintiff

on September 20, 1991, alleging an inability to work since September 20, 1985 (Tr. 127-139). The application was denied initially (Tr. 155-157) and on reconsideration (Tr. 170-173) by the Social Security Administration ("SSA"). The Administrative Law Judge ("ALJ"), before whom Plaintiff, his attorney, and a vocational expert ("VE") appeared, considered the matter de novo, and on February 25, 1994 (Tr. 11-26), found that Plaintiff was not under a disability. The Appeals Council denied Plaintiff's request for review on July 7, 1994 (Tr. 5-6), therefore, the ALJ's decision became the final decision of the Commissioner of the SSA, subject to judicial review.

II.   STATEMENT OF FACTS.

Plaintiff's September 20, 1991 application for SSI payments (Tr. 91-94), based on disability, alleges an inability to work due to two cervical fusions, chronic alcoholism, and depression (Tr. 16, 128, 177). Plaintiff has a high school education, has completed a 16 week secretarial course, and has taken some college classes (Tr. 65-66, 181). He has worked as an accounts payable clerk, grinder, assembler, and a press operator (Tr. 70-73, 181).

A.   Medical Evidence.

The medical record indicates that the plaintiff injured his cervical spine while at work on February 12, 1981 (Tr. 212). On January 11, 1982 the plaintiff underwent a neurosurgical examination (Tr. 202). At this time the plaintiff complained of pain in his neck and arms, and his neck motion was limited. He was diagnosed with a ruptured cervical disc for which his doctors recommended surgery (Tr. 202).

On February 4, 1982 the plaintiff underwent a cervical discectomy[1] at C5-6 (Tr. 220-221). Plaintiff's postoperative course was satisfactory and he was discharged on February 11, 1982. Dr. Garrett G. Gillespie opined that the plaintiff was disabled and would remain so indefinitely (Tr. 221).

Apparently the plaintiff returned to work in 1984 (Tr. 71-72). However, in June, 1985 while working, he suffered another cervical injury (Tr. 72). Plaintiff was examined by

_____

[1]An excision of an intervertebral disc. See Dorland's Illustrated Medical Dictionary, 28th ed (Dorland's), at p. 492.

Dr. Gillespie in September, 1985 at which time he complained of neck and left arm pain (Tr. 203). His neck motion was 40% of normal, although his shoulder motion was good, and while Plaintiff had pain to palpation, his strength and reflexes were intact (Tr. 203). Dr. Gillespie diagnosed a cervical spine injury, ruled out ruptured cervical disc, and stated that the plaintiff has a continuing disability from his June, 1985 injury. A myelogram, performed in September, 1985, reportedly showed a lesion at C4-5 which Dr. Gillespie believed was a combination of spondylosis[2] and a midline ruptured disc (Tr. 204, 222).

Dr. Gillespie continued to follow the plaintiff in October and November, 1985, where the plaintiff's complaints and findings remained essentially the same (Tr. 204-205). At the November exam, Dr. Gillespie recommended that the plaintiff undergo another cervical discectomy, this time at C4-5 (Tr. 205). This surgery was performed on November 18, 1985 (Tr. 223-224). Plaintiff's postoperative course was satisfactory and he was discharged on November 25, 1985 (Tr. 224).

In June, 1986 Dr. Gillespie found that the plaintiff's neck motion was 70% of normal, and recommended that the plaintiff begin walking two miles per day and continue weight loss (Tr. 206). He opined that the plaintiff was not able to work but may be able to "get into . . . some sort of selected light placement position." X-rays of the plaintiff's cervical spine, taken on June 29, 1986 found cervical anterior fusions at C4-5 and C5-6 and small bilateral posterior spurs at C3-4 and C4-5 (Tr. 227).

Plaintiff was followed by Dr. Gillespie in July, 1986 and October, 1986, at which time he suggested that the plaintiff lose weight and attend a pain management program (Tr. 207-208). In October, the plaintiff's blood pressure was elevated (Tr. 208). Also at this exam, Dr. Gillespie opined that the plaintiff met the criteria for "disability."

Plaintiff continued to complain of pain, swelling and limited movement with regard to his neck and arms at examinations in April, 1987, and June, 1987 (Tr. 209-210). By June the plaintiff had lost some weight and his blood pressure had decreased somewhat (Tr. 210). A myelogram, performed in June, 1987, revealed postoperative changes at C4-5 and C5-6, with

---

[2]A general term for degenerative changes due to osteoarthritis. Dorland's at p. 1564.

spinal stenosis[3] present at this level, but no indication of a herniated disc (Tr. 245).

On July 25, 1987, Dr. Gillespie wrote a letter to the plaintiff's attorney opining that the plaintiff had a 50% permanent partial disability with regard to his right upper extremity, a 30% permanent partial disability with regard to his left upper extremity, and a 50% permanent partial disability of his cervical spine, resulting in a 50% permanent partial disability of Plaintiff's whole body (Tr. 212).

An examination by Dr. Gillespie on November 4, 1987 found that the plaintiff's neck motion was 50% of normal, with some tenderness and spasm in the area (Tr. 213-214). However, the plaintiff's right shoulder motion was normal and his left shoulder motion was 70% of normal, and his strength and reflexes were intact. These findings remained the same at a February, 1988 exam (Tr. 215). A cervical MRI, performed on March 7, 1988, revealed fusion at the C4 through C6 levels, a slight right bulging of the C2-3 disc, with no herniation, and a slight prominence of the posterior inferior aspect of the medulla (Tr. 228).

Dr. Gillespie noted that the plaintiff's findings remained the same at an exam in June, 1988 and stated that the plaintiff had reached an end result as he would not recommend any further treatments or investigative procedures (Tr. 216). At a follow-up exam in January, 1989, the plaintiff's blood pressure was down and his neck motion was limited (Tr. 217). Dr. Gillespie again stated his belief that the plaintiff was disabled at this time. Plaintiff's condition was unchanged at a July 1989 exam (Tr. 218).

On April 27, 1990, Dr. Robert M. D'Agostino, a board certified family practitioner, completed a report of medical findings which indicated that the plaintiff was moderately obese, had a mildly enlarged heart with some dyspnea[4] and angina, but

_____

[3]A narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, parathesias, and neurogenic claudication. Dorland's at p. 1576.

[4]Difficult or labored breathing. Dorland's at p. 518.

4

had a good functional capacity and only mild arteriosclerosis (Tr. 246-249). The plaintiff was also described as being status-post spinal fusion and having depression and possible hypertension. According to Dr. D'Agostino, the plaintiff was able to walk, and use his upper extremities without any limitations (Tr. 248). Additionally, the plaintiff was able to stand, sit, kneel, bend, push, and pull on a limited basis.

Plaintiff was examined by Dr. D'Agostino in September, 1990 (Tr. 250). At this time the plaintiff was complaining of neck pain, and had limited cervical spine motion, but had no weakness in his extremities and had good sensation. Plaintiff's physical exam was unchanged at an October, 1990 exam (Tr. 250). On December 4, 1990 Dr. D'Agostino prescribed Vasotec[5] for the plaintiff's high blood pressure (Tr. 255). This medication was successful in reducing the plaintiff's blood pressure, but the dosage had to be increased at two points (Tr. 255-256, 259). The plaintiff was also prescribed Prozac,[6] beginning in February, 1991 to improve his depression (Tr. 256). In March, 1991, the plaintiff stated that his depression was "somewhat improved." Also during this month the plaintiff overdosed on his Prozac and Vasotec, for which he refused medical treatment (Tr. 258-259).

On May 4, 1991, the plaintiff was brought to Nashua Memorial Hospital Emergency Room (ER) by the Mount Vernon Police department (Tr. 317-340). On this date, the plaintiff had been drinking heavily and was threatening suicide. The plaintiff was treated at the ER for chest pains and transferred to New Hampshire Hospital on May 5, 1991 for psychiatric treatment (Tr. 317-340, 547).

The plaintiff remained at New Hampshire Hospital for three days (Tr. 547-598). At the time of his discharge, on May 7, 1991, the plaintiff was diagnosed with alcohol dependence and rule out personality disorder, antisocial [sic] (Tr. 547-550). The plaintiff's stressors were found to be moderate and his global assessment functioning (GAF) score was 65 (Tr. 549).

Plaintiff was admitted to Catholic Medical Center for treatment of his alcoholism on May 9, 1991 (Tr. 266-277). While at the Center, the plaintiff was evaluated by a psychiatrist to

---

[5]See Physician's Desk Reference, 49th ed. (PDR), at p. 1651.

[6]PDR at p. 944.

rule out a diagnosis of depression (Tr. 269). Dr. Thomas C. Meehan examined the plaintiff and found that he was alert and oriented with normal speech, perception, and gross memory. Plaintiff's mood was neutral and his range of affect was normal to somewhat decreased (Tr. 269). His thinking was well organized and goal oriented. There was no delusional thinking or suicidal ideation (Tr. 269). Dr. Meehan doubted that the plaintiff had a primary mood disorder and felt that an adjustment disorder with depressed mood was probably the most appropriate diagnosis. Additionally, Dr. Meehan found no evidence of an antisocial personality disorder and no need to transfer the plaintiff to inpatient psychiatry (Tr. 269).

Also while at the Center, the plaintiff was examined by Dr. David B. Lewis for his neck complaints (Tr. 270-271). At this examination the plaintiff's cervical motion was somewhat limited and his shoulder motion was normal (Tr. 270). Plaintiff's motor strength was normal, his Hoffman's sign[7] was negative, and his reflexes were intact. He did have some trigger points (Tr. 270). Dr. Lewis diagnosed the plaintiff as status-post C5-6 and C4-5 fusion/laminectomy, with post-laminectomy syndrome; possible cervical spinal stenosis; chronic pain and sleep disturbance; and probable myofascial pain with multiple trigger points. An X-ray of the plaintiff's cervical spine revealed complete fusion of C4-5 and C5-6, and flattening of the anterior curve, compatible with muscular spasm (Tr. 276). Additionally, an MRI of this area was essentially normal, with no evidence of recurrent disc herniation or spinal stenosis (Tr. 277).

The record shows that the plaintiff experienced decreased neck symptoms after being prescribed Amitriptyline[8] (Tr. 268). Further the record shows that the plaintiff's blood tests, including liver function tests, were essentially normal (Tr. 267, 272-275). Plaintiff was discharged from the Center on May 28, 1991 (Tr. 267).

Plaintiff was next seen at the St. Joseph Hospital's ER on September 11, 1991 complaining of lumbar and left leg pain (Tr.

_____

[7]Increased excitability to electrical stimulation in the sensory nerves. Dorland's at p. 1276.

[8]This is indicated for the relief of symptoms of depression. PDR at p. 2441.

6

230-231). An X-ray of the plaintiff's lumbosacral spine found only degenerative disc disease at L4-5 (Tr. 232). Plaintiff was treated with Percocet and released (Tr. 230-231).

On October 7, 1991 the plaintiff returned to Dr. D'Agostino who found the plaintiff's physical findings, including his blood pressure, an electrocardiogram and blood tests, to be essentially normal (Tr. 263). The plaintiff was diagnosed with hypertension, hypercholesterolemia,[9] and chronic pain secondary to spinal fusion.

Casey Chapman, a family counselor of the Clearview Center, completed a medical report in February, 1992 which stated that while the plaintiff was still a little anxious and depressed, his depression had become more manageable since he stopped drinking (Tr. 278-279). Additionally, Mr./Ms. Chapman noted that the plaintiff was oriented to time, person, and place, did not have any thought disorders, and had fairly good attention and concentration. S/he stated that the plaintiff was not disabled (Tr. 279).

An exam by Dr. D'Agostino in April, 1992 noted that the plaintiff had not taken his high blood pressure medication for the past couple of months, however his blood pressure appeared stable (Tr. 263). Moreover, a psychiatric evaluation performed by Dr. Robert Feder in May, 1992 revealed that the plaintiff had logical, coherent and goal-directed thought, with no bizarre behaviors and no psychotic symptoms (Tr. 280-282). Additionally, Dr. Feder noted that the plaintiff denied suicidal or homicidal ideation, was fully oriented and had good memory (Tr. 281-282). Dr. Feder found that the plaintiff had only mild anxiety and a mildly depressed mood (Tr. 281). Plaintiff was diagnosed with alcohol dependence, in remission, dysthymia, and post-traumatic stress disorder (Tr. 282). He was found to have moderate stressors and a GAF of 55. Dr. Feder opined that the plaintiff would be able to understand, remember, and carry out most work-related tasks, and would be able to respond appropriately to supervisors and co-workers.

On June 1, 1992 the plaintiff was apparently seen as an outpatient at St. Joseph's Hospital with a urinary tract infection (Tr. 233-236). Plaintiff returned to the hospital on

---

[9]An excess of cholesterol in the blood. Dorland's at p. 792.

June 8, 1992, at which time he was admitted for further urological evaluation, including a cystopanendoscopy, which revealed a recurrent bacterial prostatitis (Tr. 237-244). Plaintiff was prescribed Bactrim[10] and released the same day. A follow-up exam in August, 1992 noted that the plaintiff had not had any further urologic symptoms (Tr. 284).

Plaintiff returned to Dr. D'Agostino in November, 1992 complaining of back and left leg pain (Tr. 311). Upon examination, Dr. D'Agostino found that the plaintiff's reflexes, motor power and sensation were all intact. Additionally, the plaintiff was able to straight leg raise to 80 degrees on the left and 85 degrees on the right (Tr. 311). Dr. D'Agostino diagnosed the plaintiff with low back pain with left sciatica, and prescribed bed rest and Naprosyn.[11] Within three weeks, the plaintiff reported that he had improved significantly, and Dr. D'Agostino recommended that the plaintiff return to activity as tolerated (Tr. 312).

In May 1993, Dr. D'Agostino completed a medical evaluation review of the plaintiff which showed that the plaintiff's blood pressure was stable, that he was still in alcohol remission, and that he essentially had normal strength with some paresthesias[12] in his left lower extremity (Tr. 313-316). Dr. D'Agostino found that Plaintiff had a fair to good prognosis for all of his conditions and would probably be able to return to gainful employment. He recommended that the plaintiff be referred to vocational rehabilitation (Tr. 312, 316).

The plaintiff went to the New England Rehabilitation Center of Southern New Hampshire in July 1993 for a functional capacities evaluation (Tr. 296-297). The musculoskeletal evaluation demonstrated postural deviations, gait deviations, decreased range of motion of the neck and poor lower back strength and apparent poor abdominal strength (not properly

---

[10]This is indicated in the treatment of urinary tract infections. PDR at p. 2029.

[11]This is indicated in the relief of mild to moderate pain. Id. at p. 2478.

[12]Abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus. Dorland's at p. 1234.

assessed secondary to complaints of pain) (Tr. 296). The functional evaluation noted sedentary - light lifting capacity, deconditioned status, pain focus and very poor body mechanics (Tr. 296). The assessment stated the plaintiff had not been participating in any type of exercise over the past 8 years (1985-1993) which resulted in overall stiffness, weakness and poor conditioning (Tr. 297). It was felt the pain focus could interfere with his desire to become more functional (Tr. 297). The recommendations included: physical therapy, review of relaxation techniques and vocational counselling to pursue a job at the sedentary to light exertional level (Tr. 197). The following should be considered when pursuing a job goal: part-time work initially; the ability to alternate sitting, standing and walking on the job; a proper work station would be beneficial which would include an ergonomic chair with lumbar support and arm rests, a footstool, a slanted work table that would allow work to be performed with neck in a neutral position; and occasional breaks for stretching would have to be incorporated into the work day (Tr. 297).

B.    Hearing Testimony

1.    Claimant

At the hearing held September 30, 1993, the plaintiff testified he was 5' 9" and weighed 210 pounds (Tr. 64). He stated he had graduated from a 16 week word processing secretarial program after his first injury in 1981 and was currently taking two college courses (Tr. 66, 72). He complained about his computer course in which the sitting caused him to experience pain radiating into his arms and stiffness in his neck (Tr. 66). He volunteered six hours per week at a soup kitchen where he sent out thank you letters and worked on the newsletter (Tr. 69).

He related that he was injured on the job while performing his duties as a press operator in February 1981 and then injured in June 1985 in an automobile accident while in the course of his job as an accounts payable clerk (Tr. 71-72). In this job he stated he spent most of the time sitting but also did some lifting (Tr. 74). His disability reports in 1989 and 1991 indicated the job, in addition to sitting 5-6 hours per day, involved 3-4 hours standing and walking and occasional bending and reaching (Tr. 182, 374).

9

Plaintiff testified that he was a chronic alcoholic who lost his driver's license sometime prior to December 1985 because he was driving while intoxicated (Tr. 78). He drank almost on a daily basis excessive amounts of alcohol for the period December 1985 to May 1991 (Tr. 78). He would drink beer and sometimes liquor (Tr. 79). The alcohol abuse caused him to experience blackouts (Tr. 76-77, 79). He was also experiencing depression during that time (Tr. 78). He received treatment for his alcoholism for three days in 1899 at Keystone Hall after there was an allegation he molested his daughter (Tr. 80-82). However, he continued to drink after that (Tr. 82). Between 1985 and 1991 he napped often when he was drinking (Tr. 101).

With regard to the period between September 1985 and June 1988, Plaintiff testified that he had to give up outdoor sports he used to engage in for fear of re-injuring himself (Tr. 84). He said his treating doctor limited him to lifting five to ten pounds and advised him to walk three miles per day (Tr. 84). He had problems writing because his hand would cramp up and he would experience a throbbing pain (Tr. 85). When he sat for short periods, his neck would stiffen up (Tr. 85). He testified he would place a heating pad on his neck for 15 minutes, at times using it up to four or five times a day to relieve the pain (Tr. 86). He turned to alcohol to deal with the pain because his doctor was afraid to give him pills (Tr. 86). He assumed it was because of his prior suicide attempt (Tr. 86). Plaintiff stated he also experienced neck spasms since his second surgery which was in 1986 (Tr. 87). He took Naprosyn since 1990 for the spasm but refused to take any pain medication for fear that it might affect his sobriety (Tr. 87).

Plaintiff stated that he was receiving marriage counselling, family counselling, and group counselling for his family problems (Tr. 89, 103-104). He discussed his post traumatic stress disorder with Dr. D'Agostino and attended three to five AA meetings per week for his alcoholism (Tr. 89-90).

In response to inquiry about why he felt he could not work, he testified that the pain he experienced in his neck and his arm prevented him from working (Tr. 92, 94). He mentioned numbness in his hand and sometimes feeling something like a bolt of electricity going through his arm (Tr. 94). He did not have many pain free periods (Tr. 95). The cold weather and the humidity exacerbated his pain (Tr. 95). Overhead reaching, bending over to pick something up, climbing stairs, pushing and pulling with his arms and using his right foot to drive a car were activities

10

the plaintiff stated caused pain (Tr. 97-98). He indicated that he had ability to sit in one position for up to an hour at times and other times only five to ten minutes (Tr. 99). His ability to stand was good some days and bad on others (Tr. 100). He felt he could lift occasionally ten pounds but tried to limit it to five (Tr. 101). He limited his driving because of the restrictions on turning his head and doing dishes caused him to stiffen up and get sore (Tr. 102-103).

2. <u>Vocational Expert</u>

Catherine Chandick appeared as a vocational expert (VE) at the plaintiff's hearing. She testified that the plaintiff's prior work history included jobs as an accounts payable clerk (skilled work, sedentary level of exertion); grinding machine setup and operator (skilled work, medium level exertion); kitchen cabinet assembler (unskilled work, medium level exertion); and press operator (unskilled work, medium level exertion) (Tr. 105).

The ALJ asked the VE whether there was work an individual could perform who: was limited to lifting and carrying ten pounds, must avoid environments where alcohol was served or made, must avoid humidity and extreme cold, must avoid vibration, must avoid more than minimal overhead reaching and must avoid repetitive use of the upper extremity (Tr. 107). The VE responded that such an individual could perform a general office clerk job which existed at the sedentary (1,810 in N.H./497, 681 in U.S.A.) and light (891 in N.H./245, 127) levels of exertion (Tr. 108). The VE testified that there were other jobs that could be performed by an individual with the limitations presented above. They included: a skilled cashier position which exited at the sedentary (1,907 in N.H./410,039 in U.S.A.) and light (1,985 in N.H./426,775 in U.S.A.) levels of exertion (Tr. 109); an unskilled security guard position at sedentary and light levels of exertion (3,000 in N.H./860,000 in U.S.A.); a sedentary semiskilled clerical job (1,000 in N.H./233,300 in U.S.A.); and a sedentary unskilled cashier position (3,500 in N.H./726,000 in U.S.A.) (Tr. 110).

In response to a second hypothetical in which the ALJ asked the VE to assume that the individual, in addition to the above limitations, could not do frequent lifting secondary to uncontrolled use of alcohol, the VE said that all jobs would be comprised (Tr. 110). In a third hypothetical posed to the VE, the ALJ asked her to assume the limitations in the first hypothetical and a mild to moderate impairment in concentration

11

secondary to depression or post traumatic stress disorder (Tr. 110). The VE responded that the individual would not be able to perform the skilled cashier position and general office clerk position (Tr. 111). She felt the unskilled cashier position and the unskilled security guard positions could still be performed (Tr. 111). In the final hypothetical question posed to the VE, she was again asked to assume the limitations in the first hypothetical and also assume the numbness of fingers on the dominant hand would interfere with prolonged or fine finger dexterity (Tr. 111). She responded that would affect the individual's ability to perform the jobs mentioned above except for the unskilled security guard position (Tr. 111).

Counsel for the plaintiff, after pointing out that the Dictionary of Occupational Titles (DOT) listed the unskilled security guard position as requiring light level exertion, questioned the VE as to how many positions existed at the sedentary level of exertion and her basis for saying that this position existed at the sedentary level of exertion (Tr. 114-118). The VE responded that she relied upon her experience and secondary source material to estimate that there were 1,000 sedentary unarmed security guard positions in New Hampshire (Tr. 114-118). Counsel asked for further documentation from the VE regarding her testimony as to sedentary unskilled cashier jobs and sedentary, unskilled security jobs in New Hampshire because the DOT did not make it clear that a job such as unarmed security guard existed in substantial numbers at the sedentary level of exertion (Tr. 118-123). In response to this request, the VE and counsel after the hearing submitted information and arguments concerning the existence and numerosity of sedentary unskilled cashier jobs and sedentary unskilled security guard jobs (Tr. 341-342, 535-542, 543-546, 599-600, 601-606).

Discussion

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In reviewing a Social Security disability decision, the factual

12

findings of the Secretary "shall be conclusive if supported by `substantial evidence.'" Irlanda Ortiz v. Secretary of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).[13] The court "`must uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)); accord Richardson v. Perales, 402 U.S. 389, 401 (1971). The record must be viewed as a whole to determine whether the decision is supported by substantial evidence. Frustaglia v. Secretary of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Rodriguez, 647 F.2d at 222. Moreover, "[i]t is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." Irlanda Ortiz, 955 F.2d at 769

---

[13]Substantial evidence is "`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

(citing <u>Rodriguez</u>, 647 F.2d at 222); <u>see also</u> <u>Burgos Lopez v. Secretary of Health & Human Servs.</u>, 747 F.2d 37, 40 (1st Cir. 1984).


I.   <u>Implied Reopening of Application for Disability Insurance Benefits</u>

As an initial matter the plaintiff contends that the ALJ reopened the plaintiff's unsuccessful claims for disability insurance benefits by referring to medical records pertaining to the plaintiff's medical condition while he was insured for benefits, <u>i.e.</u>, before July 1, 1988.  Although the plaintiff never brought an action in a district court to review these claims, he now argues that the ALJ's reliance on pre-1988 medical evidence constitutes a constructive reopening of his claims and requires the court to assume jurisdiction over prior clims.

In <u>Morin v. Secretary of Health & Human Servs.</u>, 835 F. Supp. 1414, 1422 (D.N.H. 1992), the court found that an ALJ had reopened a prior application for benefits where he expressly construed the application to include an application for a reopening of a prior denial, considered new evidence relating to the prior application, made no specific refusal of the request to reopen the prior denial, and reached the merits of the reopened claim in his decision.  The facts of this case are unlike those presented by <u>Morin</u>.  Although the ALJ construed the plaintiff's

14

request for benefits as a request to open the prior denials of his disability insurance benefits claim and took the request to reopen under advisement, Tr. at 61, she expressly denied the plaintiff's request in her decision, noting that the new evidence presented was not material to the time period through June 30, 1988, Tr. at 15. As a result, the ALJ never reached the merits of the plaintiff's previous claims, other than to review the plaintiff's medical history. Cf. Frustaglia, 829 F.2d at 193 (ALJ permitted to consider evidence from a prior denial to determine whether claimant is disabled at time of current application). Accordingly, the court finds that the ALJ did not reopen the plaintiff's prior claims for disability insurance benefits, and considers only the plaintiff's current claim for supplemental benefits.

II. The ALJ's Sequential Analysis

Relying on the testimony of the vocational expert, the ALJ denied the plaintiff's claim for benefits after finding that the plaintiff was able to do his past relevant work as an accounts payable clerk and that there was a significant number of other light jobs that the plaintiff could perform. Tr. at 8-9. The plaintiff contends that the ALJ's conclusions concerning the plaintiff's ability to perform any work are flawed because she

15

failed to consider all of the plaintiff's physical and mental impairments, and that the ALJ's conclusions concerning his past relevant work are flawed because she failed to comply with Social Security Ruling 82-62.

A.   The ALJ Properly Set Forth the Plaintiff's Impairments

   1.   The Need to Alternate Positions

The plaintiff first argues that the ALJ failed to consider the plaintiff's inability to perform work that would not permit him to alternate sitting, standing, and walking.  In support of his claim that he was impaired in this manner, the plaintiff cites a vocational report prepared by the New England Rehabilitation Center (Tr. at 296-97) indicating that the plaintiff would have to be able to alternate these activities in any job that he performed.

The court finds that the ALJ was not required to reach the conclusion that the plaintiff needed to alternate positions because the opposite conclusion was supported by substantial evidence.  Indeed, neither of the two physicians who performed residual functional capacity assessments on the plaintiff included an alternation requirement in cataloging the limitations on the plaintiff's ability to work.  Tr. at 162-69.  This omission is particularly significant given that the residual

16

functional capacity assessment form includes a box for the physician to mark if such a limitation is applicable.  Tr. at 165.  Although the ALJ might have reached a different conclusion, this is not grounds for reversal.  See, e.g., Irlanda Ortiz, 955 F.2d at 769.

### 2.  Alcohol Dependence

The plaintiff next claims that the ALJ erred in failing to consider his dependence on alcohol in reaching her conclusions concerning the plaintiff's ability to work.  However, the ALJ specifically considered this issue and concluded that the plaintiff's alcohol dependence was not an impairment when he applied for supplemental benefits:

> The claimant did have a severe alcohol related impairment prior to the date of his filing for supplemental security income benefits; however, within twelve months of his filing date, his alcoholism was in remission through treatment and he had the ability to perform both light and sedentary work.  Since filing his Title XVI claim, the claimant has demonstrated the ability to control his use of alcohol.  The claimant's counselor at Clearview Center, Casey Chapman, reported that the claimant's attention and concentration seemed fairly good and she did not feel that he was disabled.  Dr. [Robert] Feder reported on May 14, 1992, that the claimant would be able to understand, remember and carry out most work-related tasks.  Dr. Feder also reported that the claimant would be able to respond appropriately to supervisors and co-workers.

Tr. at 21.  The ALJ's references to the reports of Casey Chapman, who indicated that the plaintiff might have been disabled at the

17

beginning phases of recovery but was no longer disabled as of February 26, 1992, and Dr. Feder, who indicated that the plaintiff "had been able to maintain his sobriety since May of 1991 and is very active in AA, attending at least one meeting a day," Tr. at 280, support the conclusion that alcohol dependence did not limit the plaintiff's ability to perform work at the time he applied for SSI benefits or at any time thereafter. Moreover, the plaintiff testified at the hearing that he had been sober for nearly twenty-months. Tr. at 32. Accordingly, the court finds that the ALJ's determination concerning the plaintiff's alcohol dependence was supported by substantial evidence.

### 3. Depression and Post-Traumatic Stress Disorder

Relying on the conclusion of Dr. Feder, Tr. at 282, the plaintiff contends that the ALJ failed to take into consideration the effect that his depression and post-traumatic stress disorder had on his ability to perform sustained work for a complete eight-hour day. However, the ALJ specifically found that the plaintiff "seldom experiences deficiencies of concentration, persistence or pace" and concluded that the claimant's mental impairments were not severe as of the date of his application. Tr. at 20-21. These conclusions are supported by the mental residual functional capacity assessment of Dr. Nicholas Kalfas,

18

who, after considering Dr. Feder's initial evaluation, concluded that

> despite his impairments(s) [the plaintiff] is able to understand, remember, and carry out instructions with reasonably good attention and concentration for extended periods of time. He is able to maintain a schedule and to complete a normal work day. He is able to interact appropriately with coworkers and super-visors although he may become irritable on being stressed as a[n] artifact of his dysthymia. He is able to adapt appropriately to minor changes in a low stress work setting.

Tr. at 153. Leaving the resolution of conflicts in the record to the ALJ, the court finds that the ALJ's conclusions concerning the plaintiff's mental impairments were supported by substantial evidence.

### 4. Limitations Caused by Pain

The plaintiff contends that the ALJ failed to properly consider the limitations on the plaintiff caused by pain. Specifically, he contests the ALJ's conclusions that (1) the objective evidence belies the plaintiff's contention that his pain prevents him from performing any work, Tr. at 19; and (2) the plaintiff's allegations of inability to work because of pain were not entirely credible, Tr. at 20.

The ALJ is required to consider the subjective complaints of pain or other symptoms by a claimant who presents a "clinically determinable medical impairment that can reasonably be expected

19

to produce the pain alleged." 42 U.S.C. § 423(d)(5)(A); Avery, 797 F.2d at 21; 20 C.F.R. § 404.1529. "[C]omplaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." Dupuis v. Secretary of Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989); see Bianchi v. Secretary of Health & Human Servs., 764 F.2d 44, 45 (1st Cir. 1985) ("The Secretary is not required to take the claimant's assertions of pain at face value.") (quoting Burgos Lopez v. Secretary of Health & Human Servs., 747 F.2d 37, 40 (1st Cir. 1984)). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. 20 C.F.R. § 404.1529(d). A claimant's medical history and the objective medical evidence are considered reliable indicators from which the ALJ may draw reasonable conclusions regarding the intensity and persistence of the claimant's pain. Avery, 797 F.2d at 23; 20 C.F.R. § 404.1529(c)(3). However, situations exist in which the reported symptoms of pain suggest greater functional restrictions than can be demonstrated by the medical evidence alone. Id.

When a claimant complains that pain or other subjective symptoms are a significant factor limiting his ability to work, and those complaints are not fully supported by medical evidence contained in the record, the ALJ must undertake further

20

exploration of other information.  Avery, 797 F.2d at 23.  The ALJ must consider the claimants's prior work record; daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness and side effects of any medication taken to alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other symptoms, past or present; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain.  20 C.F.R. § 404.1529(c)(3); Avery, 797 F.2d at 23; SSR 88-13.  Moreover, when assessing credibility the ALJ may draw an inference that the claimant would have sought additional treatment if the pain was as intense as alleged.  See Irlanda Ortiz, 955 F.2d at 769.  If the complaints of pain are found to be credible under the criteria, the pain will be determined to diminish the claimant's capacity to work.  42 U.S.C. § 423(d); 20 C.F.R. § 404.1529(c)(4).  Finally, the court gives deference to credibility determinations made by the ALJ, particularly where the determinations are supported by specific findings. Frustaglia, 829 F.2d at 195 (citing DaRosa v. Secretary of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1985)).

21

The court notes at the outset that the ALJ was entitled to find that the clinical evidence in the record is inconsistent with the plaintiff's claim that pain prevents him from working entirely. Most tellingly, the residual functional capacity assessment performed on the plaintiff in January 1992, and confirmed in October 1992, specifically found that "the severity or duration of [the plaintiff's symptoms] . . . is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determined impairments." Tr. at 167. Moreover, the disability determination rationale issued in October, 1992, acknowledges that the plaintiff continued to experience pain and discomfort from his history of back and neck problems at the time he applied for SSI benefits, but specifically indicates that "none of [his] conditions are so severe as to prevent him from working" and that the plaintiff is capable of light work. Tr. at 161.

As for the plaintiff's subjective complaints of pain, the ALJ issued findings of fact that support her conclusion that the plaintiff's subjective complaints were not entirely credible. Specifically, the ALJ noted that the plaintiff only took Naprosyn to relieve his neck pain and was able to work in a soup kitchen, sit through classes lasting two hours and thirty-five minutes, take walks, visit relatives, attend Alcoholics Anonymous

22

meetings, cook breakfast and lunch, and even ride his bicycle. Tr. at 6-7. The record indicates that the ALJ complied with Avery by questioning the plaintiff about his pain at the hearing and, after having an opportunity to assess the plaintiff's demeanor, concluded that his subjective complaints of pain were not credible. The court will not disturb this finding.

In sum, the court finds that the testimony of the vocational expert was based on hypotheticals that correctly described the plaintiff's impairments. As such, the testimony constituted substantial evidence upon which the ALJ was entitled to rely.

B. Compliance with SSR 82-62

The plaintiff argues that the ALJ's conclusion that the plaintiff was able to perform his past relevant work is flawed because she failed to make specific findings concerning the physical and mental demands of the plaintiff's past work, as required by SSR 82-62. The Commissioner argues that the ALJ was not required to make such a finding because the plaintiff failed to meet his threshold burden of demonstrating an inability to perform his prior relevant work.

In order to trigger the ALJ's duty to make specific findings of fact as to the physical and mental demands of past relevant work, a claimant must "lay the foundation as to what activities

23

[his] former work entailed [and] must point out (unless obvious) . . . how [his] functional incapacity renders [him] unable to perform [his] former usual work." Curtis v. Sullivan, 808 F. Supp. 917, 923 (D.N.H. 1992) (quoting Santiago v. Secretary of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991)). A claimant's past relevant work is considered not only as the claimant actually performed it, but as it is performed in the national economy. Parizo v. Secretary of Health & Human Servs., No. 92-514-M, slip op. at 6 (D.N.H. March 29, 1994) (citing Santiago, 944 F.2d at 5; 20 C.F.R. § 404.1520(e); SSR 82-62).

The only evidence the plaintiff offered at the hearing to describe his accounts payable clerk position was his testimony that he "did the daily deposits and . . . the accounts payable" and that he "vouchered all the incoming invoices." Tr. at 74. The plaintiff stated that in performing these tasks he would not have to lift items heavier than a ledger, and would only have to do so if he was sent on "daily errands like to pick up office supplies." Tr. at 74-75. Standing by itself, this description did not establish a threshold showing that the plaintiff could not perform his former job as he actually performed it and as it is performed in the national economy. Thus, the ALJ had no obligation to develop the record further. The court finds no error.

24

## Conclusion

The plaintiff's motion to remand the Commissioner's decision (document no. 13) is denied. The defendant's motion to affirm the Commissioner's decision (document no. 16) is granted. The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

April 30, 1996

cc:  Raymond J. Kelly, Esquire
     David L. Broderick, Esquire

25